UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| ANDY MAHLER, <br> LINDA LEE, <br> SHANE MURPHY, <br> ROBBIE HEINRICH, <br> HEARTWOOD, <br> PROTECT OUR WOODS, <br> INDIANA FOREST ALLIANCE INC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, <br> THOMAS J. VILSACK in his official capacity as Secretary of the Department of Agriculture, <br> UNITED STATES DEPARTMENT OF AGRICULTURE, <br> RANDY MOORE in his official capacity as Chief of the United States Forest Service, <br><br> Defendants. | Case No. 4:24-cv-00174-TWP-KMB |

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on a Motion for Preliminary Injunction (Filing No. 26) filed by Plaintiffs Andy Mahler, Linda Lee, Shane Murphy, Robbie Heinrich, Heartwood, Protect Our Woods, and Indiana Forest Alliance Inc. (collectively, "Plaintiffs"). Plaintiffs filed this action against Defendants the United States Forest Service, Thomas J. Vilsack, the United States Department of Agriculture, and Randy Moore (collectively, "Defendants"), asserting claims under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. Plaintiffs challenge the legality of Defendants' tornado-recovery operations, known as the Paoli Tornado Response and Research Project (the "Paoli Project"), in the Hoosier National Forest. Plaintiffs allege that Defendants improperly excluded the Paoli Project from NEPA's research and reporting requirements and began

implementing the Paoli Project before adequately studying its environmental effects. Plaintiff now seek to preliminarily enjoin Defendants' operations. For the reasons stated below, Plaintiffs' Motion for Preliminary Injunction is **denied**.

## I. BACKGROUND

### A. NEPA and the APA

The controlling statute at issue here, NEPA, "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). It has been described as a 'procedural' or 'action-forcing' statute that does not 'mandate particular results' but instead requires agencies to study and describe the environmental consequences of their proposed actions. *Id*. at 348–51; *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351.

NEPA requires all federal agencies to prepare certain reports if their proposed actions might have a significant effect on the environment. If a proposed action *will* have a significant effect, the agency must prepare a detailed environmental impact statement ("EIS") reviewing the environmental impacts of the proposed action and alternatives to it. 42 U.S.C. § 4332(2)(C). If it is uncertain whether the proposed action will have a significant effect, then the agency must prepare an environmental assessment ("EA"). An EA is a shorter, rough-cut, low-budget EIS, which is designed to determine whether a "full-fledged" EIS is needed. *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 856 (7th Cir. 2003).

Certain agency actions are categorically excluded from EA/EIS requirements because the agency has determined that those actions normally do not have a significant environmental effect. 42 U.S.C. § 4336(a); 40 C.F.R. § 1501.4(a). If a categorical exclusion applies to a proposed action, the agency must still "evaluate the action for extraordinary circumstances in which a normally

excluded action may have a significant effect." 40 C.F.R. § 1501.4(b). "Extraordinary circumstances" include anything that "may" have a significant effect on the environment. *Id.* § 1508.1(o). An agency should consider seven "resource conditions" to determine whether extraordinary circumstances exist. 36 C.F.R. §§ 220.6(b)(1)(i)–(vii) The two resource conditions at issue here are threatened or endangered species and archaeological sites or historic properties or areas. *Id.* § (b)(1)(i), (vii). If the agency determines that no extraordinary circumstances exist, then the agency may apply the categorical exclusion and implement the proposed action. Otherwise, the agency must prepare an EA or EIS. 40 C.F.R. § 1501.4(b)(2).

The APA provides the standard of review for Plaintiffs' challenge of Defendants' use of categorical exclusions. *See Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003). In a suit under the APA, a district court sits as a reviewing court, much like an appellate court. *Cronin v. U.S.D.A.*, 919 F.2d 439, 443-44 (7th Cir. 1990). With very rare exception, the court does not take new evidence and considers only matters within the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard of review is narrow and requires that the court "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Highway J*, 349 F.3d at 952–53. The Court may not substitute its judgment regarding the environmental consequences of an action for that of the agency. *Id.* at 953. However, the Court must ensure "that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

**B.     The Paoli Project**

The Paoli Experimental Forest is 632 acres within the Hoosier National Forest dedicated to forest ecosystem research (Filing No. 13-1 ¶ 4; AR0000181, AR0000034). These areas are home

3

to several threatened and endangered species, including several species of bat (AR0000175). Thousands of historic cultural sites have also been found in the Hoosier National Forest, some of which are eligible for protection under the National Historic Preservation Act (Filing No. 8-6). In August 2023, severe storms and a tornado ripped through southern Indiana, damaging over one third of the Paoli Experimental Forest (AR0000033, AR0000746). The storms not only damaged trees, but also deposited debris into Dry Run creek, threatening flooding and road damage, and at the mouth of a cave used by tricolored bats (AR0000034; Filing No. 13-1 ¶¶ 17–18).

In December 2023, the Forest Service issued a scoping notice for the Paoli Project (AR0000181). The scoping notice did not state that the Forest Service planned to apply any categorical exclusions. *Id.* The Paoli Project area is within the boundary of a preexisting Forest Service project, the Buffalo Springs Project. The Forest Service had already prepared an EA and started work on the Buffalo Springs Project by the time the tornado hit the Paoli Experimental Forest. For the Paoli Project, the Forest Service proposed 138 acres of salvage logging for dead and dying trees, debris removal, tree planting, and deer fencing. In January 2024, some of the Plaintiffs submitted written objections to the proposed Paoli Project (AR0000186–AR0000222). By spring 2024, Protect Our Woods and Heartwood had retained counsel and announced their readiness to sue over the Paoli Project (Filing No. 30-2 at 1, 20).

Before approving the Paoli Project, the Forest Service complied and prepared several documents related to the potential environmental effects of its proposed action. With respect to wildlife, the Forest Service prepared a Biological Evaluation that concluded that the Paoli Project was "not likely to adversely affect Indiana bat, northern long-eared bat, tri-colored bat, and little brown bat." (AR0000287). The Forest Service then issued an Amended Biological Evaluation, noting that tornado debris was blocking a hibernaculum for tricolored bats, restricting the bats'

ingress/egress and airflow, and the Paoli Project salvaging would remove that blockage (AR0000750–AR0000751). Around the same time, the United States Fish and Wildlife Service issued an amendment to an earlier Biological Opinion for the Buffalo Springs Project, concluding that the Forest Service's proposed salvage and debris removal work would have a "neutral overall effect" on resident bat species (AR0000347). Hoosier National Forest Wildlife Biologist Steve Harriss ("Mr. Harriss") also prepared a supplemental Specialist Response to the Paoli Project Preliminary Project Proposal, which identified the blocked hibernaculum and stated that removing the blockage would be beneficial to the tricolored bat (AR0000159–AR0000160).

As for historic sites, in June 2024, the Forest Service, Tribal Nations, and the Indiana State Historic Preservation Officer entered into a Programmatic Agreement for the area of the Buffalo Springs Project (AR0000001). The Programmatic Agreement is intended to ensure that any historic cultural resources will be avoided during the project, and it allows the Forest Service to survey for historic sites in phases before implementing the project. Pursuant to the Programmatic Agreement, Forest Service Heritage Program Manager, Forest Archaeologist, and Tribal Liaison Teresa Villalobos ("Ms. Villalobos") conducted a survey of archaeological sites in the Paoli Project salvage/debris removal area, the results of which are described in a written report (AR0000500). Ms. Villalobos identified thirteen historic sites, only two of which are eligible for federal protections ([Filing No. 13-3](Filing No. 13-3) ¶ 4). Ms. Villalobos was unable to survey approximately forty-five acres due to hazardous conditions, but she concluded there was a "low probability for cultural resources" in that area due to its steep slope (AR0000522).

In August 2024, the Forest Service issued a Decision Memorandum (the "Decision") authorizing the Paoli Project (AR0000033). The Forest Service determined that three categorical exclusions applied. 36 C.F.R. §§ 220.6(e)(5) (regeneration of area to native tree species), (13)

(salvage of dead/dying trees), and (19) (removal of debris). The Decision discussed the seven resource conditions under 36 C.F.R. § 220.6(b)(1), including threatened or endangered species and archaeological sites or historic properties or areas, and it concluded that no extraordinary circumstances existed that would preclude application of the categorical exclusions.

**C.     This Lawsuit**

In October 2024, Plaintiffs began corresponding with the Forest Service regarding potential litigation over the Paoli Project. *Id.* The Forest Service sent Plaintiffs' updates on the progress of the Paoli Project but did not indicate any willingness to pause or stop work. The Forest Service solicited bids for the salvage logging sale in November 2024 and had awarded and executed a contract by December 9, 2024. The timber sale began December 11, 2024, though logging operations did not begin until late December (Filing No. 30-1 ¶ 2).

On December 16, 2024, Plaintiffs initiated this action by filing a Complaint (Filing No. 1), followed by a Motion for TRO (Filing No. 8) and original Motion for Preliminary Injunction (Filing No. 9). On December 23, 2024, the Court denied the Motion for TRO, finding that Plaintiffs had not clearly shown that they would suffer imminent irreparable harm before Defendants could be heard in opposition (Filing No. 16). The parties then met with the Magistrate Judge, conferred about expedited discovery, and proposed a briefing and hearing schedule. Plaintiffs filed the instant Motion for Preliminary Injunction on January 15, 2025 (Filing No. 26). Upon Plaintiffs' request, the Court set the Motion for oral argument (Filing No. 24 at 1; Filing No. 28).

The week before oral argument, Defendants manually filed a copy of the Administrative Record, as supplemented by agreement of the parties (Filing No. 29; Filing No. 30). The parties also filed witness and exhibit lists (Filing No. 35 at 5; Filing No. 36; Filing No. 37). Plaintiffs listed three Forest Service employees as witnesses—District Ranger Christopher Thornton ("Ranger Thornton"), Mr. Harriss, and Ms. Villalobos—and served subpoenas on those witnesses.

Defendants moved to quash the subpoenas and objected to Plaintiffs offering any evidence outside the scope of the Administrative Record ([Filing No. 34](); [Filing No. 35]()). Defendants argued that because this is an APA case, any evidence outside the Administrative Record is irrelevant and invites error. The Court denied the motion to quash and overruled Defendants' objection ([Filing No. 39]()). However, the Court allotted thirty-minutes at the start of oral argument to discuss the admissibility of extra-record evidence. *Id.* at 7.

At the February 3, 2025 oral argument, both parties explained their positions as to the admissibility of Plaintiffs' anticipated testimony and evidence. The Court conditionally allowed Plaintiffs' counsel to present their anticipated testimony and evidence over Defendants' standing objection, pending a written ruling on Plaintiffs' Motion for Preliminary Injunction. Plaintiffs called five witnesses: Ranger Thornton; Mr. Harriss; Ms. Villalobos; Plaintiff Robbie Heinrich ("Mr. Heinrich"); and Steven Stewart ("Mr. Stewart"), a member of Heartwood and Protect Our Woods. Defendants' counsel did not cross examine any of the witnesses but later asked Ms. Villalobos two omitted questions. Both parties also presented argument on the merits of Plaintiffs' Motion for Preliminary Injunction, which the Court took under advisement.

## II.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To obtain a preliminary injunction, the party seeking relief must show:

> (1) it has some likelihood of success on the merits of its claim; (2) it has no adequate remedy at law; (3) without relief it will suffer irreparable harm. If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction. However, if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction and consider whether an injunction is in the public interest.

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citations and quotation marks omitted). "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

### III.     DISCUSSION

The Court will first discuss the admissibility of the evidence offered by Plaintiffs at oral argument and then turn to the merits of Plaintiffs' request for injunctive relief.

#### A.     Admissibility of Evidence Offered at Oral Argument

Defendants argue that the evidence offered at oral argument falls outside the scope of the Administrative Record and is therefore inadmissible in this APA case. For the reasons discussed below, the issue of irreparable harm is dispositive of Plaintiffs' Motion for Preliminary Injunction, so the Court **overrules in part** Defendants' objection, and will consider evidence relevant to irreparable harm, which the Court discusses in this Order. Because the Court does not reach Plaintiffs' likelihood of success on the merits of their claims, it **otherwise sustains** Defendants' objection.

#### B.     Plaintiffs' Motion for Preliminary Injunction

As previously stated, to obtain a preliminary injunction, Plaintiffs must establish: (1) they have some likelihood of success on the merits of their claims; (2) they have no adequate remedy at law; and (3) absent relief, they will suffer irreparable harm. *GEFT*, 922 F.3d at 364. If Plaintiffs fail to show any of these three requirements, the Court must deny their request for a preliminary injunction. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008), *abrogated on other grounds by Nken v. Holder*, 556 U.S. 418, 434 (2009). The Court will begin by discussing the third requirement, irreparable harm, which is dispositive.

The United States Supreme Court has clearly held that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). A mere "possibility" is not enough. *Id.* "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*; *see Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022) ("*Winter*'s . . . 'likelihood of success' and 'likelihood of irreparable harm' requirements have teeth."). *Contra Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 979 (S.D. Ill. 1999) (awarding injunction in pre-*Winter* case based on the "potential" for "possibly irreparable" harm to the environment); *Monroe Cnty. Bd. of Comm'rs v. U.S. Forest Serv.*, No. 23-cv-12, 2023 WL 2683125, at *7 (S.D. Ind. Mar. 29, 2023) (granting preliminary injunction where plaintiffs "submitted three detailed declarations identifying with specificity" the irreparable harms likely to result from prescribed burns).

Plaintiffs allege that four types of irreparable harm may occur absent preliminary relief: (a) harm to tricolored bats; (b) damage to historic sites; (b) removal of healthy old growth trees; and (d) "informational harm." The Court will discuss each alleged harm in turn and then address Plaintiffs' request that the Court draw adverse inferences.

1. **Tricolored Bats**

Plaintiffs first identify a risk of irreparable harm to tricolored bats that are hibernating in a cave (*i.e.*, their "hibernaculum") in the Paoli Project salvage area. At oral argument, Mr. Harriss testified that a fungal disease called white-nose syndrome has decimated many Indiana bat populations, including the tricolored bat. In 2022, the United States Fish and Wildlife Service proposed listing the tricolored bat as endangered, although there is no indication as to when, or whether, the tricolored bat will be listed as endangered.

9

In their opening brief, Plaintiffs assert that "if the [Forest Service] is allowed to proceed with its logging plans for the Paoli Project near the [tricolored bat] hibernacula, including the use of heavy equipment to clear the entrance, irreparable environmental harm will occur to the [tricolored bat]," though they cite no evidence supporting this claim (Filing No. 26-1 at 29). In their reply brief, Plaintiffs assert that Defendants failed to publicly disclose their plan to clear the hibernaculum entrance and failed to adequately consider the effects of the blockage removal on the hibernating bats, and they cite several sources stating that timber operations "have the potential" to affect the bats (Filing No. 32 at 3–4). This evidence, however, does not show that the blockage removal is "*likely*" to irreparably harm tricolored bats. *Winter*, 555 U.S. at 22 (emphasis in original). Although the "potential" for significant harm might be enough to preclude the use of a categorical exclusion, it is not enough to show that a preliminary injunction is warranted.

At oral argument, Plaintiffs' counsel proffered that disturbing bats during hibernation may cause those bats to leave their hibernaculum and seek out a new hibernaculum, which may be infected with white-nose syndrome. But Plaintiffs' counsel acknowledged that this risk of harm is wholly speculative, stating "you would have to be somewhat psychic to know what the bats are going to do when disturbed and whether it's going to lead to more desolation of their population." At oral argument, Plaintiffs' counsel questioned Mr. Harriss about the potential effects of the blockage removal, but Mr. Harriss testified that only "repeat disturbances" will affect hibernating bats, and "one-time disturbances" are "acceptable" to them. *Earth Island Inst. v. Carlton*, No. CIV. S-09-2020, 2009 WL 9084754, at *27 (E.D. Cal. Aug. 20, 2009) ("Defendants' experts' testimony seriously undermines the soundness of plaintiff's claims of likely irreparable harm such that the court cannot find that plaintiff has made the requisite showing under *Winter*.").

Plaintiffs have therefore failed to show likely irreparable harm to tricolored bats. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (affirming district court's finding that plaintiffs failed to show likely irreparable harm to woodpeckers resulting from Forest Service's logging activities).

**2. Historic Sites**

Plaintiffs next argue that without an injunction, historic sites in the Paoli Project area may be irreparably harmed. Plaintiffs acknowledge that the Forest Service applies a buffer zone protocol to ensure that logging activities do not come within a certain distance of marked historic sites (Filing No. 32 at 5–6). But they argue that because of tornado damage, dense vegetation, and/or snow cover, loggers may be unable to detect the presence of historic sites. *Id.* at 7. Plaintiffs also emphasize that Ms. Villalobos was unable to survey portions of the Paoli Project area and argue that yet-to-be discovered historic sites in that area might be overlooked and inadvertently damaged during the salvage and debris removal work.

Plaintiffs' argument about historic sites, like their argument about tricolored bats, is based on speculation. Plaintiffs offer no evidence supporting the contention that the Forest Service's marked buffer zones will not be noticed or respected by the logging contractor. The mere possibility that loggers might unintentionally intrude into a marked buffer zone is not enough to warrant a preliminary injunction. *See Colo. River Indian Tribes v. Dep't of Interior*, No. ED CV14-02504, 2015 WL 12661945, at *27 (C.D. Cal. June 11, 2015) (finding plaintiffs failed to demonstrate likely irreparable harm to historic sites in light of mitigation procedures established in programmatic agreement); *Quechan Tribe of the Ft. Yuma Indian Rsrv. v. U.S. Dep't of Interior*, No. 12cv1167, 2012 WL 1857853, at *7 (S.D. Cal. May 22, 2012) (same).

Plaintiffs' arguments about the previously un-surveyed area are also unavailing. Plaintiffs note that thousands of historic sites have been found in the Hoosier National Forest, and two were

found within the Paoli Project area. But the existence of other sites does not make it likely that other sites exist in the un-surveyed area, or that those sites will be damaged. *Colo. River Indian Tribes*, 2015 WL 12661945, at *27 ("Plaintiffs make no showing that what was discovered during [earlier] construction shows what is likely to be discovered if there is further construction . . . ."). Ms. Villalobos' survey report and live testimony show there is little risk of harm to historic sites in the un-surveyed area. Ms. Villalobos explained that because the area is on a steep slope, there is a very low probability of finding historic sites there (AR0000522 ("This area ranges from 20% to 40% slope and has low probably [*sic*] for cultural resources.")). Ms. Villalobos further testified that the inadvertent discovery of a historic site is "very unlikely," and in her twenty-year career with Hoosier National Forest, she has never been involved in an inadvertent discovery case. More importantly, Ms. Villalobos testified that all the salvage and debris removal work in the previously un-surveyed area was completed prior to oral argument, and that she surveyed the area afterwards and found no historic sites. Plaintiffs have therefore failed to demonstrate a likelihood of irreparable harm to historic sites.

### 3. Healthy Old Growth Trees

Third, Plaintiffs argue irreparable harm may occur from the loss of healthy old growth trees, but this argument was entirely undeveloped in Plaintiffs' written briefs. Plaintiffs' briefs state, "[i]f old growth trees are cut, historic sites disturbed, or endangered species harmed here, no after-the-fact legal action will provide a remedy." (Filing No. 26-1 at 28; Filing No. 32 at 8). Aside from this one sentence, Plaintiffs make no mention of old growth trees. Plaintiffs focus only on the risk of harm to tricolored bats and historic sites (Filing No. 26-1 at 29 (describing only irreparable harm to tricolored bats and historic sites)). The Seventh Circuit has repeatedly stated that perfunctory and undeveloped arguments are waived. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments

12

are waived, as are arguments unsupported by legal authority."); *Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002) (stating that where party fails to support position with any legal analysis or citation, the argument is waived). Although Plaintiffs' counsel developed this claim at oral argument, the Seventh Circuit has held that new arguments may not be raised for the first time at oral argument. *See Quality Oil, Inc. v Kelley Partners, Inc.*, 657 F.3d 609, 614–15 (7th Cir. 2011); *Szczesny v. Ashcroft*, 358 F.3d 464, 465 (7th Cir. 2004).

Even if Plaintiffs had timely raised this argument, they have shown only the mere possibility that healthy old growth trees will be removed absent injunctive relief. Plaintiffs offer the testimony of three individuals related to old growth trees: Plaintiff's Andy Mahler ("Mr. Mahler"); Mr. Stewart; and Mr. Heinrich. In Mr. Mahler's Declaration (Filing No. 8-2), he states that the Paoli Experimental Forest contains "mature and old growth forest," including a particularly striking white oak tree, and he expresses his general "concern[]" that some of that old growth will be cut down during the Paoli Project (Filing No. 8-2 ¶¶ 47–48). During oral argument, Mr. Stewart testified that he visited the Paoli Project area before and after work began, that he observed several old growth trees, and that the striking white oak sadly had been removed. Mr. Heinrich testified that his family has occupied land near the Paoli Experimental Forest for generations[1] and that he visited the Paoli Project area before and after the tornado, and before and after the Paoli Project work began. After the tornado, Mr. Heinrich saw both downed and live trees and found the scenery "fascinating." Mr. Heinrich, his children, and his friends enjoyed exploring the area and viewing

---

[1] Mr. Heinrich testified that his ancestors were deeded the land by the fourth president of the United States, James Madison. Before and during Madison's presidency, then-Territorial Governor William Henry Harrison used a variety of methods to negotiate "low-cost" treaties on behalf of the President to acquire Native American lands, including modern-day southern Indiana. Juan F. Perea, *Denying the Violence: The Missing Constitutional Law of Conquest*, 24 Univ. Pa. J. Const. L. 1205, 1263–65 (2022); Christian Webber, *Aiding Employment and the Environment on Tribal Lands: An Analysis of Hiring Preferences and Their Use in the Mining Industry*, 12 Ariz. J. 298, 301 (2022). The United States then sold those lands for a "substantial" profit. Scott A. Taylor, *The Unending Onslaught of Tribal Sovereignty: State Income Taxation of Non-Member Indians*, 91 Marquette L.R. 917, 945–46 (2008).

13

the large oak and hickory trees there. Mr. Heinrich also stated that after the Paoli Project work began, he could hear and see chainsaws, heavy machinery, and new logging roads.

This testimony, even when taken together, does not demonstrate a likelihood of irreparable harm. At most, this testimony shows that old growth trees exist in the Paoli Project area, that one such tree was removed, and that the removal of other old growth trees is possible. Plaintiffs have not offered evidence showing that removal is likely, and Defendants have offered evidence to the contrary. At oral argument, Defendants reiterated that pursuant to 36 C.F.R. § 220.6(e)(13), the Forest Service will conduct only "incidental removal" of live trees for landings, skid trails, and road clearing, which limits the number of live trees that may be removed and reduces the chance that any live old growth trees will be removed. Ranger Thornton also testified that as of February 3, 2025, approximately ninety percent of the salvage work for the Paoli Project had been completed. Plaintiffs have identified only one old growth tree, the white oak, that was removed over the course of that work. Plaintiffs offer no evidence that other live, old growth trees will likely be removed in the last ten percent of the salvage work. *See Conservation Cong. v. U.S. Forest Serv.*, No. 13-cv-1922, 2016 WL 6524860, at *4 (E.D. Cal. Nov. 3, 2016) (finding plaintiffs only showed that old growth trees might possibly be felled and removed and failed to show that felling and removal was likely).

Plaintiffs' irreparable harm argument relies entirely on the possibility that healthy old growth trees might be removed. Even despite Plaintiffs' waiver of this argument, Plaintiffs have failed to demonstrate likely irreparable harm resulting from the removal of healthy old growth trees. *Winter*, 555 U.S. at 22.

    **4. Informational Harm**

Plaintiffs lastly identify an "informational harm," which Plaintiffs describe as a harm resulting from Defendants "undercutting" statutory schemes and proceeding with the Paoli Project

14

without adequate environmental information. Like their old-growth-tree argument, Plaintiffs failed to address this harm in their written briefs and therefore waived it. *See M.G. Skinner*, 845 F.3d at 321; *Szczesny*, 358 F.3d at 465.

Moreover, Plaintiffs have not shown a likelihood of irreparable "informational" harm. An agency's failure to comply with NEPA and fully evaluate the impact of its actions is not, by itself, an irreparable injury. *Conservation Cong.*, 2016 WL 6524860, at *5 (stating that the presumption of irreparable harm flowing from NEPA violations was "effectively overruled by the Supreme Court" in *Winter* and *Monsanto Co. v. Geertson Seed Farms*; "A NEPA violation, without more, does not establish the requisite likelihood of irreparable harm."); *Colo. River Indian Tribes*, 2015 WL 12661945, at *30 ("*Winter*. . . suggests that there is no showing of a likelihood of irreparable harm based on a freestanding procedural violation."). Plaintiffs' complaints that Defendants are implementing the Paoli Project without adequate information instead speaks to the merits of Plaintiffs' NEPA/APA claims and the balance of equities, not the likelihood of irreparable harm. The irreparable harms that could result from Defendants' allegedly uninformed actions are harm to tricolored bats, damage to historic sites, and removal of live old growth trees. But for the reasons explained above, Plaintiffs have not shown that such irreparable harms are likely to occur. *See Colo. River Indian Tribes*, 2015 WL 12661945, at *30 ("'[P]aired with some showing of harm to the sites, [an alleged] procedural injury could provide some support for a claim of irreparable harm,' but none was presented." (second alteration in original) (quoting *La Cuna de Aztlan Sacred Sites Protection Circle Advisory Comm.*, No. LA CV11-04466 (C.D. Cal. Aug. 11, 2011))).

### 5. Adverse Inference

At oral argument, Plaintiffs' counsel explained that Plaintiffs face a "difficult challenge" in proving irreparable harm because the Forest Service "controls all of the evidence," has not performed certain environmental studies, and refuses to disclose certain materials. He therefore

asked the Court to draw adverse inferences against Defendants. Plaintiffs do not specify what inferences they are asking the Court to draw; other than to infer generally that irreparable harm is likely to occur.

The Court understands that at the preliminary injunction stage, there may be a disparity in information between the parties. However, a preliminary injunction is an "extraordinary and drastic" remedy, so the movant must make a "clear showing" that he is entitled to one. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Unequal access to records does not excuse Plaintiffs from meeting this high burden. Typically, parties remedy this disparity through expedited discovery, not adverse inferences. *Capital Mach. Co. v. Miller Veneers, Inc.*, No. 09-cv-702, 2010 WL 3000769, at *1 (S.D. Ind. July 28, 2010) ("Although they say that they needed to conduct discovery before they could be sure they had sufficient evidence to request a preliminary injunction, they didn't request expedited discovery—unlike many other litigants who are concerned about truly immediate and irreparable injury.").

Further, the Court draws adverse inferences only in limited circumstances, and only when other evidence supports the requested inferences. *See United States v. Pryor*, 32 F.3d 1192, 1194–95 (7th Cir. 1994) ("At all events, adverse-inference instruction is appropriate only if there is other evidence."); *Bracey v. Grondin*, 712 F.3d 1012, 1018–19 (7th Cir. 2013) (allowing adverse inferences when a party "intentionally destroys evidence in bad faith"); *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001) (refusing to give adverse inference instruction because plaintiff offered only speculation that defendants destroyed missing documents in bad faith); *Evans v. City of Chicago*, 513 F.3d 735, 740 (7th Cir. 2008) (allowing adverse inferences in civil cases when witness refuses to answer question on Fifth Amendment grounds). The Seventh Circuit has specifically discouraged courts from allowing the type of inference that Plaintiffs request here—

16

the inference that "evidence not produced would have been adverse to the party who could have, but did not, produce it." *Pryor*, 32 F.3d 1194–95.

Plaintiffs did not raise the issue of adverse inferences in their written briefs, *M.G. Skinner*, 845 F.3d at 321; *Szczesny*, 358 F.3d at 465, but even at oral argument, Plaintiffs offered no evidence supporting the use of adverse inferences. Plaintiffs merely argued that if Defendants had been "more forthcoming," they would have produced unfavorable evidence. *Pryor*, 32 F.3d 1194–95. However, nothing in the record indicates that Defendants withheld evidence relevant to irreparable harm. Plaintiffs had ample opportunity to conduct discovery on the risk of irreparable harm, but they chose not to. Before Plaintiffs filed the instant Motion for Preliminary Injunction, the parties conferred about expedited discovery. Plaintiffs initially requested discovery related to the administrative record and the Forest Service's decisionmaking process, (Filing No. 20 at 5–8), but they did not seek discovery related to irreparable harm and later decided not to move for any other discovery (Filing No. 24 at 2). The Forest Service was not obligated to provide discovery relevant to irreparable harm absent a request by Plaintiffs or an order compelling production. *See Jungiewicz v. Allstate Ins. Co.*, No. 13 C 3793, 2014 WL 1292121, at *1 (N.D. Ill. Mar. 31, 2014) (refusing to draw adverse inference due to alleged failure to produce evidence because plaintiff did not show bad faith and failed to pursue a motion to compel).

Plaintiffs have known about the specific work planned for the Paoli Project since December 21, 2024, at the latest (Filing No. 26-1 at 17–18). Between then and the February 3, 2025 oral argument, Plaintiffs could have prepared additional affidavits about the Paoli Project's effects on the environment, but they attached none to their preliminary injunction briefing. Plaintiffs also could have consulted with (or possibly retained) third party witnesses, like biologists or environmental experts, who could opine on the potential effects of this planned work, but they did

17

not. Oral argument provided Plaintiffs yet another opportunity to elicit testimony about the risk of irreparable harm. Although this Court does not typically permit the presentation of new evidence at oral argument, S.D. Ind. L.R. 7-5(b), the Court denied Defendants' Motion to Quash in part because the subpoenaed Forest Service employees could "offer testimony relevant to the risk of irreparable harm." (Filing No. 39 at 5). Plaintiffs called five witnesses, all of whom did offer or could have offered testimony relevant to Plaintiffs' claims of irreparable harm. The Forest Service employee witnesses answered all of Plaintiffs' counsels' questions, other than two questions to which Defendants raised hearsay objections. Considering the many opportunities Plaintiffs had to conduct discovery before and during oral argument, Plaintiffs have not shown that Defendants prevented them from meeting their burden, and the Court will not draw any adverse inferences.

Because Plaintiffs have not shown that they are likely to suffer any irreparable harm absent preliminary injunctive relief, the Court must **deny** their Motion for Preliminary Injunction. The Court need not, and therefore does not, address the remaining threshold requirements, the balance of equities, or the public interest. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.

### IV.    CONCLUSION

The Court agrees with Plaintiffs that damage to the environment is a type of damage that is typically irreparable, however here, the Plaintiffs have not shown imminent, irreparable harm from the remaining Project activities. For the reasons stated above, the Court **SUSTAINS in part** and **OVERRULES in part** Defendants' standing objection to the evidence offered by Plaintiffs' at oral argument and **DENIES** Plaintiffs' Motion for Preliminary Injunction (Filing No. 26).

SO ORDERED.

Date:    2/10/2025

_Hon. Tanya Walton Pratt, Chief Judge_
United States District Court
Southern District of Indiana

Distribution:

Mick G. Harrison
Law Office of Mick G. Harrison
mickharrisonesq@gmail.com

Reade Wilson
DOJ-Enrd
reade.wilson@usdoj.gov